# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

ALFRED BROWN,

               Plaintiff,

   v.

DAVID KYLE, et al.,

              Defendants.

_____/

CASE NO. 1:04-cv-06539-AWI-SKO PC

FINDINGS AND RECOMMENDATIONS
RECOMMENDING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT BE GRANTED
IN PART AND DENIED IN PART

(Doc. 67)

THIRTY-DAY OBJECTION PERIOD

## Findings and Recommendations on Motion for Summary Judgment

### I.  Procedural History

Plaintiff Alfred Brown, a state prisoner proceeding pro se and in forma pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983 on November 15, 2004.  This action is proceeding on Plaintiff's amended complaint, filed on October 23, 2006, against Defendants Kyle, Domingo, and Ruff for acting with deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth Amendment of the United States Constitution.[1]  Plaintiff is pursuing two separate claims in this action.  The first claim arose from the alleged failure to provide adequate medical care for the injuries Plaintiff sustained in a fall on November 11, 2002, and the second claim arose from the alleged failure to remove or otherwise treat Plaintiff's painful skin tags in a timely manner.

---

[1] On June 8, 2011, the Court recommended dismissal of Defendant Ruff based on insufficient information to effect service of process.  Fed. R. Civ. P. 4(m).  That recommendation is still pending consideration by Honorable Anthony W. Ishii and to avoid undue confusion regarding the parties to the motion for summary judgment, Defendant Ruff is identified hereinafter as Nurse Ruff.

1

1    On March 8, 2011, Defendants Kyle and Domingo filed a motion for summary judgment and

2    on May 18, 2011, Plaintiff filed an opposition.[2]  Defendants filed a reply on May 26, 2011, and

3    Plaintiff filed a motion to strike the reply as untimely on June 7, 2011.

4    **II.    Plaintiff's Motion to Strike the Reply**

5    Local Rule 230(l) provides that a reply must be served within seven days of service of the

6    opposition.  Relying on the prison mailbox rule to establish that the date of service of his opposition

7    was May 9, 2011, Plaintiff seeks to have Defendants' May 26 reply stricken as untimely.

8    Whenever a prisoner uses an internal prison mail system and the record allows the court to

9    determine the date on which the filing was turned over to prison authorities, it is that date which is

10   deemed to be the filing date.  Houston v. Lack, 487 U.S. 266, 270, 487 S.Ct. 2379 (1988); Caldwell

11   v. Amend, 30 F.3d 1199, 1202 (9th Cir. 1994).  This so called "mailbox rule" is applied to pro se

12   prisoners' legal filings to ensure that their filings are not unfairly barred as untimely due to delays

13   beyond their control.  Douglas v. Noelle, 567 F.3d 1103, 1107 (9th Cir. 2009).

14   The prison mailbox rule is not intended for use against an opposing party to unfairly prevent

15   consideration of that party's filings.  Given that the Court, and therefore presumably Defendants as

16   well, did not receive the opposition until May 18, 2011, Defendants could not have filed a reply

17   within seven days of May 9, 2011.  Plaintiff's motion to strike Defendants' reply is without merit

18   and the Court recommends that it be denied.

19   **III.   Defendants' Motion for Summary Judgment**

20        **A.    Legal Standard**

21   Any party may move for summary judgment, and the Court shall grant summary judgment

22   if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

23   to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual

24   Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is

25   disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record,

26   including but not limited to depositions, documents, declarations, or discovery; or (2) showing that

27

28   [2] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the Court in an order filed on May 27, 2009.  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (Doc. 29.)

the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). While the Court *may* consider other materials in the record not cited to by the parties, it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

As the moving parties, Defendants bear the initial burden of proving the absence of a genuine dispute of material fact. In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)) (quotation marks omitted). Because Plaintiff bears the burden of proof at trial, Defendants need only prove that there is an absence of evidence to support Plaintiff's case. In re Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 326) (quotation marks omitted). If Defendants meet their initial burden, the burden shifts to Plaintiff to designate specific facts demonstrating the existence of genuine issues for trial. Id. (citing Celotex, 477 U.S. at 324). However, Plaintiff need not file any countervailing declarations or other materials if Defendants' papers are insufficient on their face to demonstrate the lack of any material issue of fact. Kaiser Cement Corp. V. Fischbach and Moore, Inc., 793 F.2d 1100, 1103-04 (9th Cir. 1986); Lew v. Kona Hosp., 754 F.2d 1420, 1423 (9th Cir. 1985) (quotation marks omitted).

In resolving Defendants' motion for summary judgment, all of the evidence must be viewed in the light most favorable to Plaintiff as the non-moving party, Garcia v. County of Merced, 639 F.3d 1206, 1208 (9th Cir. 2011); Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011), and all reasonable inferences must be drawn in his favor, LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1136 (9th Cir. 2009); Pinard v. Clatskanie School Dist. 6J, 467 F.3d 755, 763 (9th Cir. 2006). Further, Plaintiff's papers are treated more indulgently since he is the nonmoving party. Lew, 754 F.3d at 1423.

**B.     Defendants' Evidentiary Objections**

Any party may object to the other's evidence on the ground that it cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(2) (quotation marks omitted). In their reply, Defendants object to Plaintiff's evidence on the grounds that (1) Plaintiff's documentary

evidence is irrelevant or not properly authenticated or both, and (2) Plaintiff failed to support his

statements disputing their facts with a declaration or other satisfactory means.

### 1.    Relevance

Given the Court's duty to determine whether there exists a genuine dispute as to any *material*

fact, an independent objection to evidence as irrelevant is both unnecessary and unhelpful. E.g.,

Carden v. Chenega Sec. & Protections Servs., LLC, No. CIV 2:09-1799 WBS CMK, 2011 WL

1807384, at *3 (E.D.Cal. May 10, 2011); Arias v. McHugh, No. CIV 2:09-690 WBS GGH, 2010

WL 2511175, at *6 (E.D.Cal. Jun. 17, 2010); Tracchia v. Tilton, No. CIV S-06-2916 GEB KJM P,

2009 WL 3055222, at *3 (E.D.Cal. Sept. 21, 2009); Burch v. Regents of the University of California,

433 F.Supp.2d 1110, 1119 (E.D.Cal. Jun. 5, 2006).  Defendants' objection on relevancy grounds is

therefore disregarded.

### 2.    Authentication

Unauthenticated documents cannot be considered in a motion for summary judgment, Las

Vegas Sands, LLC v. Nehme, 632 F.3d 526, 533 (9th Cir. 2011) (citing Orr v. Bank of America, NT

& SA, 285 F.3d 764, 773 (9th Cir. 2002)) (quotation marks omitted), and therefore, lack of proper

authentication can be an appropriate objection where the documents' authenticity is genuinely in

dispute.   However, where a document has been authenticated by a party, the authentication

requirement is satisfied for all parties as to that document.  Orr, 285 F.3d at 776.

With the exception of Exhibits C and K, Plaintiff's documentary evidence consists of prison

records maintained in his central and medical files and most of the documents relied upon to resolve

Defendants' motion were submitted in the first instance by Defendants.[3]  Accordingly, Defendants'

objection is overruled as to the documents duplicative of those they submitted in support of their

motion for summary judgment.  Id.

Regarding the other prison records, an inquiry into authenticity concerns the genuineness of

an item of evidence, not its admissibility, Orr, 285 F.3d at 776, and documents may be authenticated

---

[3] Neither Exhibit C nor Exhibit K is considered by the Court in resolving the pending motion.  Exhibit C is properly excluded given that it is an unsigned, typewritten note of unknown origin.  Exhibit K is a copy of Plaintiff's claim filed with the Board of Control.  That record is not subject to reasonable dispute, Fed. R. Evid. 901(b)(4), but it is irrelevant to the resolution of the motion.

by review of their contents if they appear to be sufficiently genuine, Las Vegas Sands, LLC, 632 F.3d at 533 (citing Orr, 285 F.3d at 778 n.24) (quotation marks omitted). No suggestion was made that these documents are not official prison records from Plaintiff's file(s). The characteristics of the records themselves in terms of appearance, contents, and substance lead the Court to conclude easily that the documents have been authenticated by their distinctive characteristics and that they are what they appear to be: official prison records. Fed. R. Evid. 901(b)(4); Las Vegas Sands, LLC, 632 F.3d at 533; see also Abdullah v. CDC, No. CIV S-06-2378 MCE JFM P, 2010 WL4813572, at *3 (E.D.Cal. Nov. 19, 2010) (finding an objection for lack of foundation and authentication unavailing where the records were from the plaintiff's prison file and they were created and maintained by prison officials); Sanchez v. Penner, No. CIV S-07-0542 MCE EFB P, 2009 WL 3088331, at *5 (E.D.Cal. Sept. 22, 2009) (overruling lack of foundation and proper authentication objections to prison medical records submitted by the plaintiff); Johnson v. Roche, No. CIV S-06-1676 GEB EFB P, 2009 WL 720891, at *6 (E.D.Cal. Mar. 13, 2009) (overruling lack of foundation and proper authentication objections to prison records); Burch, 433 F.Supp.2d at 1119 (overruling objections to the introduction of documentary evidence where the defendants did not actually dispute the authenticity of them and where the plaintiff would be able to authenticate them at trial).

If Defendants genuinely disputed the authenticity of any of these records, they could have made specific objections as to those records. Notably, they did not and their bare objection to Plaintiff's prison records for lack of proper authentication is overruled. Fed. R. Evid. 901(b)(4); Las Vegas Sands, LLC, 632 F.3d at 533.

### 3.    Verified Pleading and Opposition

Finally, Defendants' contention that Plaintiff's statements in response to their undisputed facts are inadmissible is rejected. It is well-established that verified pleadings and verified oppositions constitute opposing declarations so long as they are based on personal knowledge and they set forth facts admissible in evidence to which the declarant is competent to testify, Moran v. Selig, 447 F.3d 748, 759-60 (9th Cir. 2006); Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000); Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998); Schroeder v. McDonald, 55 F.3d 454, 460 n.11 (9th Cir. 1995); McElyea v.

5

1  <u>Babbitt</u>, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam); <u>Lew</u>, 754 F.2d at 1423, with personal

2  knowledge and competence to testify inferable from the declarations themselves, <u>Barthelemy v. Air</u>

3  <u>Line Pilots Ass'n</u>, 897 F.2d 999, 1018 (9th Cir. 1990) (per curiam) (quotation marks omitted); <u>also</u>

4  <u>Sea-Land Service, Inc. v. Lozen Intern, LLC</u>, 285 F.3d 808, 819 (9th Cir. 2002).  Plaintiff's amended

5  complaint and Plaintiff's opposition are both verified, and therefore, they function as opposing

6  declarations to the extent they set forth admissible facts within Plaintiff's personal knowledge.[4],[5]

7          **C.**    **Plaintiff's Eighth Amendment Medical Care Claims**

8               **1.**    **Injuries Sustained in Fall on November 11, 2002**

9                    **a.**    **Undisputed Facts**[6]

10       At the time of the events at issue, Plaintiff was an inmate in the custody of the State of

11  California at the California Substance Abuse Treatment Facility (CSATF) in Corcoran.  (Doc. 17,

12  Amend. Comp.)  Defendant Kyle was employed as a doctor with the California Department of

13  Corrections and Rehabilitation (CDCR) at CSATF, and Defendant Domingo was employed as a

14  Registered Nurse with CDCR at CSATF.  (Doc. 67-3, Def. Ex. A, Domingo Dec., ¶1 & Def. Ex. B,

15  Kyle Dec., ¶1.)

16       On November 11, 2002, Plaintiff sustained a laceration above his left eye that was

17  approximately one inch in length.  (Domingo Dec., ¶10; Kyle Dec., ¶2; Def. Ex. C, pp. 26, 48, 135.)

18  The cut was treated with Betadine, which is a topical antiseptic/antibiotic, and three sutures were

19  applied.  (Domingo Dec., ¶10; Kyle Dec., ¶3; Ex. C, pp. 48, 135.)  After Plaintiff's condition was

20  determined to be stable, he was discharged and sent back to his housing unit.  (Domingo Dec., ¶10;

21  Ex. C, pp. 48.)

22       Prior to receiving the cut, Plaintiff had been prescribed Naproxen, a nonsteroidal anti-

23  inflammatory drug (NSAID) used for the treatment of pain.  (Kyle Dec., ¶4; Ex. C, p. 95.)  The

24  _____

25      [4] Plaintiff's opposition consists of three separately-filed parts, but all three parts are verified.  (Docs. 77-79.)

26      [5] This is a medical care case and Plaintiff is not a medical expert.  Therefore, Plaintiff may not offer as evidence his own opinion on matters which require scientific, technical, or other specialized knowledge, although he

27  may attest to medical matters that do not fall within the scope of Rule 702.  Fed. R. Evid. 701, 702.

28      [6] This section is comprised of the facts set forth by Defendants in their statement of undisputed facts.  Those facts brought into dispute by Plaintiff through admissible evidence are omitted.

prescription was valid from October 16, 2002, to December 15, 2002, and the dosage was as needed, up to three times a day. (Ex. C, p. 95.)

On November 12, 2002, Plaintiff was brought into the C-Facility clinic because the cut to his forehead was bleeding. (Domingo Dec., ¶11; Kyle Dec., ¶5; Ex. C, p. 134.) Defendant Domingo applied a new bandage over the sutures and referred Plaintiff to Defendant Kyle. (Domingo Dec., ¶11; Kyle Dec., ¶5; Ex. C, p. 134.) Defendant Kyle did not order x-rays or an ophthalmology consultation at that time, but he ordered an MRI of Plaintiff's face and eye areas the next day. (Kyle Dec., ¶¶6, 8; Ex. C, pp. 31, 94.)

On November 18, 2002, the stitches above Plaintiff's left eye were removed. (Domingo Dec., ¶12; Kyle Dec., ¶9; Ex. C, p. 133.) The same day, Plaintiff handed Defendant Domingo a request form for a doctor's appointment. (Domingo Dec., ¶12.) As a registered nurse, Defendant Domingo was sometimes responsible for planning and implementing nursing care, including the scheduling of inmate appointments for the doctor's line. (Id., ¶2.) This scheduling was done based on the severity of the inmate's medical condition. (Id., ¶3.) When inmates provided Defendant Domingo with a request for the doctor's line, she would review the request to determine if urgent medical care was needed. (Id., ¶4.) If she determined that no urgent care was necessary, she would prioritize the appointments and schedule them in an order based on need for treatment. (Id.)

On December 13, 2002, Defendant Kyle examined Plaintiff and ordered x-rays of Plaintiff's facial area, prescribed Tylenol, and referred Plaintiff to Dr. Kazi, an ophthalmologist. (Kyle Dec., ¶¶12, 13; Ex. C, pp. 21, 32.)

On January 31, 2003, Plaintiff's facial area was x-rayed and the radiologist determined that Plaintiff's nasal bones were fractured. (Kyle Dec., ¶18; Ex. C, p. 105.) On February 3, 2003, Defendant Kyle met with Plaintiff to discuss his pending ophthalmology consultation and on February 7, 2003, Defendant Kyle met with Plaintiff to discuss the x-ray findings. (Kyle Dec., ¶¶19, 20; Ex. C, pp. 18, 29.) Plaintiff had a non-displaced fracture of his nasal bone and while simple fractures of the nasal bone do not necessarily require treatment, Defendant Kyle referred Plaintiff for an ENT (ear, nose, and throat) consultation. (Kyle Dec., ¶20; Ex. C, pp. 29, 105.) No treatment other than pain management is indicated for non-displaced fractures of the nasal bone and they pose

no risk of harm to the patient.  (Kyle Dec., ¶21.)

On February 20, 2003, Plaintiff was seen by Dr. Kazi, an ophthalmologist, and diagnosed with PVD (posterior vitreous detachment) of the eye, with a floater and ocular allergies.  (Kyle Dec., ¶22; Ex. C, p. 132.)  Dr. Kazi noted that there were no breaks or tears in the eye and recommended a follow-up appointment in six months.  (Kyle Dec., ¶22; Ex. C, p. 132.)  PVD is a common condition and, absent a retinal tear, it poses no risk to an individual's health or eyesight.  (Kyle Dec., ¶23.)  In most cases of PVD, the only treatment required is monitoring of the patient.  (Id.) Defendant Kyle was not aware that Plaintiff had PVD until he received Dr. Kazi's consultation report, and on February 25, 2003, he issued Plaintiff a prescription for Patanol Optho, an antihistamine that relieves eye irritation.  (Kyle Dec., ¶¶24, 25; Ex. C, p. 16.)

On March 21, 2003, Defendant Kyle prescribed Naphazoline eye drops for Plaintiff.  (Kyle Dec., ¶28; Ex. C, pp. 15, 29.)

On April 24, 2003, Defendant Kyle again examined Plaintiff and reviewed the results of Plaintiff's ophthalmology consultation.  (Kyle Dec., ¶31; Ex. C, p. 30.)

On June 18, 2003, Defendant Kyle followed up on Plaintiff's complaints of eye pain and prescribed pain medication.  (Kyle Dec., ¶36; Ex. C, p. 30.)

On July 23, 2003, Plaintiff was seen in the optometry clinic to be fitted for and receive adjustments on glasses.  (Kyle Dec., ¶39; Ex. C, p. 26-A.)

On August 20, 2003, Plaintiff was sent to the ophthalmologist for a follow-up appointment. (Kyle Dec., ¶40; Ex. C, p. 151.)  The ophthalmologist's report indicated there that were no retinal breaks, bleeds, or holes.  (Kyle Dec., ¶40; Ex. C, p. 152.)

On October 14, 2003, Defendant Kyle issued Plaintiff a ninety-day prescription for Celebrex for pain, and on October 24, 2003, Plaintiff was prescribed Naphazoline eye drops.  (Kyle Dec., ¶¶42, 42; Ex. C, pp. 6, 59.)  On October 30, 2003, Plaintiff was again seen by the optometry clinic to be fitted for and receive adjustments on eye glasses.  (Kyle Dec., ¶44; Ex. C, pp. 6, 144.)

On April 30, 2004, Plaintiff was seen by the optometry clinic to receive reading glasses, and on May 4, 2004, Plaintiff was referred to the ophthalmologist for a follow-up appointment.  (Kyle

1   Dec., ¶¶49, 50; Ex. C, pp. 45, 148.)[7]

2   On June 19, 2004, Plaintiff was seen by the CDCR vendor to receive his glasses, and on July

3   6, 2004, Plaintiff was sent to the ophthalmologist for a follow up appointment. (Kyle Dec., ¶¶56,

4   57; Ex. C, pp. 58, 146.)

5                                 **b.      Defendants' Position**

6   After Plaintiff sustained a one-inch laceration above his left eye, it was treated with Betadine

7   and stitched up.  Plaintiff was released back to his housing until, but the next day the laceration

8   began to bleed.  Defendant Domingo applied a new bandage and referred him to Defendant Kyle.

9   While Defendant Kyle is required to refer inmates to outside specialists if medically necessary and

10  he always does so, he did not order x-rays or an ophthalmology consultation at that time because

11  Plaintiff's left eye was swollen shut and it was not possible to examine the eye or treat it with drops.

12  (Kyle Dec., ¶¶6, 7; Ex. C, p. 31.)  However, he ordered an MRI the next day.

13  On November 18, 2002, Plaintiff's sutures were removed by Defendant Domingo and he

14  handed her a request form for a doctor's appointment, which Defendant said she would give to Nurse

15  Ruff, who was in charge of appointment scheduling.  (Domingo Dec., ¶12.)  Following the

16  November 18th appointment, Plaintiff was scheduled repeatedly for medical appointments, but due

17  to multiple incidents on the yard, the doctor's line was shut down for several weeks and Defendant

18  Kyle was unable to see Plaintiff during that period of time.  (Kyle Dec., ¶10; Ex. C, p. 32.)

19  On December 11, 2002, Plaintiff was seen by Defendant Domingo, who assessed his

20  complaint of eye pain and scheduled him to see Defendant Kyle the next day. (Domingo Dec., ¶13;

21  Kyle Dec., ¶11; Ex. C, p. 2.)

22  On December 13, 2002, Defendant Kyle saw Plaintiff and examined his eye and facial

23  injuries. (Kyle Dec., ¶12; Ex. C, pp. 21, 32.)  Defendant Kyle ordered x-rays, referred Plaintiff to

24  an ophthalmologist for his eye injury, and prescribed Tylenol for pain.  The x-rays were subsequently

25  taken on January 31, 2003, and the radiologist determined that Plaintiff had fractured his nasal bones.

26  ///

27

28          [7] Ex. C, p. 148 is virtually undecipherable because the photocopy quality is so poor.  Nevertheless, there is
    no dispute between the parties that Plaintiff was referred to an ophthalmologist on this date.

On February 3, 2003, Defendant Kyle met with Plaintiff to discuss his pending ophthalmology appointment and on February 7, 2003, Defendant Kyle met with Plaintiff to discuss the results of the x-rays. Defendant explained to Plaintiff that he had a non-displaced fracture of the nasal bones, an injury which posed no risk of harm to Plaintiff and for which no treatment beyond pain management was indicated. Nevertheless, Defendant Kyle referred Plaintiff for an ENT consultation.

On February 20, 2003, Plaintiff was seen by Dr. Kazi, an outside ophthalmologist with Golden State Eye Medical Group. Dr. Kazi diagnosed Plaintiff with PVD, a common condition posing no risk to a patient's health or eyesight absent a retinal tear. In most cases, monitoring is the only necessary treatment for PVD and usually another exam is needed to ensure that there is no retinal tear. Dr. Kazi noted that there were no breaks or tears in the eye and he recommended a follow-up examination in six months.

Defendant Kyle was not aware Plaintiff had PVD until receiving Dr. Kazi's report and he met with Plaintiff on February 25, 2003. Defendant Kyle prescribed Patanol Optho, an antihistamine which relieves eye irritation, to treat Plaintiff's eye injury. Plaintiff was provided with Naphazoline, a decongestant which relieves eye pain, on February 27, 2003, and on March 5, 2003. (Kyle Dec., ¶¶26, 27.) Defendant Kyle saw Plaintiff again on March 21, 2003, and prescribed Naphazoline and Naproxin for pain. (Kyle Dec., ¶28; Ex. C, pp. 15, 29.) Plaintiff was additionally provided with Naphazoline on March 24, 3003, and on March 26, 2003. (Kyle Dec., ¶¶29, 30.)

On April 24, 2003, Defendant Kyle followed up with Plaintiff regarding the ophthalmology consult.

On June 18, 2003, Defendant Kyle saw Plaintiff regarding a complaint of eye pain and prescribed pain medication. On June 25, 2003, Plaintiff was prescribed Naproxen and Baclofen, a muscle relaxant, for pain. (Kyle Dec., ¶37.)[8]  On July 9, 2003, Plaintiff was provided with

---

[8] Although Defendant Kyle attests to this fact, Defendants' documentary evidence does not support it. According to the record, the order for these medications was made on June 25, 2002, not June 25, 2003. (Ex. C, p. 84.) It is not clear if this discrepancy is the result of a record-citation error or a misrepresentation of fact. In addition, Plaintiff challenges the prescriptions as unrelated to the medical issues relevant to this action. (Doc. 79, Opp., p. 18.)

1  Naphazoline eye drops and Celecobix, an NSAID for pain and inflammation, and on July 23, 2003,

2  Plaintiff was seen by optometry to receive eyeglasses.  (Kyle Dec., ¶¶38, 39; Ex. C, pp. 73, 26-A.)

3      On August 20, 2003, Plaintiff was seen by Dr. Katz for a follow-up appointment regarding

4  his PVD.  Dr. Katz found no retinal breaks, bleeds, or holes and he recommended another follow-up

5  in six months.

6      On October 24, 2003, Defendant Kyle saw Plaintiff and prescribed Naphazoline eye drops

7  for Plaintiff's eye.  Plaintiff was also provided with Celebrex (Celebcobix) for pain.  (Kyle Dec.,

8  ¶43; Ex. C, p. 72.)

9      On June 10, 2004, Plaintiff was again provided with Naphazoline eye drops for his eye.

10  (Kyle Dec., ¶53.)

11      Plaintiff was subsequently seen by an ophthalmologist for follow-up appointments regarding

12  his eye injury on May 4, 2004, and on July 6, 2004, and he was seen for another follow-up

13  appointment on August 16, 2004.  (Kyle Dec., ¶¶50, 57, 58; Ex. C, p. 58.)[9]

14      Plaintiff was seen by optometry on October 30, 2003, for glasses and an adjustment, and on

15  April 30, 2004, Plaintiff received reading glasses from optometry.  (Kyle Dec., ¶¶44, 49; Ex. C, pp.

16  6, 144.)  Plaintiff received glasses from a prison vendor on June 19, 2004.  (Kyle Dec., ¶56; Ex. C,

17  p. 146.)

18      Plaintiff was given a ninety-day prescription for Celecobix for pain on October 14, 2003, and

19  on January 23, 2004; he was prescribed Celecobix on December 29, 2003, and on June 17, 2004.

20  (Kyle Dec., ¶¶42, 45, 47, 55; Ex. C, pp. 59, 66, 71.)[10]  Plaintiff was also prescribed Naproxen for

21  pain on April 20, 2004.  (Kyle Dec., ¶48; Ex. C, p. 67.)

22      Defendants contend that in light of the evidence submitted, they are entitled to judgment as

23  a matter of law because Plaintiff's eye injury was treated appropriately and they were not deliberately

24  indifferent to his medical needs.  Defendants contend that they were not aware of an excessive risk

25

26      [9] Ex. C, p. 148, submitted to show the appointment of May, 4, 2004, is illegible, and there is no records
27  citation for the attestation that Plaintiff was seen on August 16, 2004.

28      [10] Ex. C, p. 9, offered to show Plaintiff was prescribed Celecobix on October 14, 2003, is a medical record
containing notes made in July 2003, and it does not relate to any event in October 2003.

to Plaintiff's health at any time.  Defendant Kyle contends that based on his medical training and experience, he did everything necessary to provide Plaintiff with appropriate medical care, and Defendant Domingo contends that at no time did she believe Plaintiff was in need of urgent care necessitating an immediate emergency appointment and she denies ever throwing away doctor's line request forms given to her by Plaintiff.

### c.    Plaintiff's Position

On November 11, 2002, Plaintiff, who is confined to a wheelchair, fell while transferring himself from a seat to his bed and he was taken to the C-Facility clinic, where he was assessed by Defendant Domingo.  (Doc. 17, Amend. Comp., court record p. 5; Doc. 78, Brown Dec., ¶¶4, 5.) Based on that assessment, Plaintiff was transported to the prison's hospital (Central Treatment Center), where Dr. Deering sutured the cut above his eyebrow.  (Brown Dec., ¶6; Def. Ex. C, p. 48, 135.)

On November 12, 2002, Plaintiff's cut began to bleed profusely and he was taken to the C-Facility Clinic, where Defendant Domingo treated him and stopped the bleeding.  (Brown Dec., ¶¶7, 8.) Plaintiff then saw Defendant Kyle and he related his medical concerns, including severe pain in his eyes, nose, and face; his fear that his eye and nose were fractured; vision problems; and numbness to the left side of his face.  (Amend. Comp., p. 6.)[11]  Defendant Kyle did not provide Plaintiff with any pain medication or other treatment, and he denied Plaintiff's request for emergency medical treatment, telling him that he was not going to see a doctor because it would cost too much to send him out.  (Amend. Comp., p. 6; Brown Dec., ¶9.)

Plaintiff admits that Dr. Dunn had prescribed Naproxen for him on a thirty-day trial basis to December 15, 2002, but he attests that the prescription was for another medical issue and Defendant Kyle did not provide anything additional to treat the pain from his injury.  (Doc. 79, Opp., p. 5:16-28.)[12]

---

[11] Page number citations given for Plaintiff's amended complaint refer to court record page numbers rather than the page numbers set forth by Plaintiff.

[12] Page number citations given for Plaintiff's opposition refer to court record page numbers rather than the page numbers set forth by Plaintiff.

Later that in the evening on November 12, 2002, Plaintiff gave Defendant Domingo an emergency doctor's line request because he was in severe pain, and on November 14, 2002, Plaintiff gave another emergency doctor's line request to Nurse Ruff. (Amend. Comp., p. 6; Brown Dec., ¶10.)

Plaintiff's sutures were removed on November 18, 2002, but that was the extent of the medical treatment he received and as he left the clinic, he handed Defendant Domingo another emergency doctor's line request. (Amend. Comp., p. 6.)

Between November 12, 2002, and December 13, 2002, Plaintiff submitted fifteen health care service request forms to Defendant Domingo and Nurse Ruff, seeking emergency medical treatment due to pain. (Amend. Comp., p. 6; Brown Dec., ¶11.) Defendant Domingo and Nurse Ruff refused to process the requests and they refused to let him see a doctor. (Amend. Comp., p. 6; Brown Dec., ¶11.) During this time period, Plaintiff talked to Defendant Domingo about his eyes and nose, having x-rays, and seeing an eye and nose doctor. (Amend. Comp., pp. 6, 7.) Several times, Defendant Domingo directed Plaintiff to contact Nurse Ruff about his requests. (Id.) Plaintiff denies that the prison was on lock-down during that period, preventing medical staff from seeing him. (Brown Dec., ¶14; Opp., p. 8:16-25.) Plaintiff attests that the institution was not shut down and on several occasions during that time, he went to the law library, which is next door to the facility medical clinic. (Amend. Comp., pp. 7, 8; Brown Dec., ¶14; Opp., p. 8:16-25.)

Plaintiff also denies that Defendant Kyle ordered an MRI for him on November 13, 2002, and points out the absence of any records regarding the MRI except for the one note, which is not signed and which is out of order. (Opp., p. 7:7-10; Def. Ex. C, p. 94.)

On November 21, 2002, Plaintiff filed an inmate appeal because he was in pain and he had not been provided with any treatment for his pain or injuries. (Brown Dec., ¶12; Pl. Ex. E.)

Plaintiff denies that he was seen by Defendant Domingo on December 11, 2002. (Brown Dec., ¶13; Opp., p. 9:14-24.) Plaintiff was not seen until December 13, 2002, at which time he was summoned to the medical clinic to see Defendant Kyle to discuss his inmate appeal. (Amend. Comp., p. 7; Brown Dec., ¶14; Opp., pp. 9:26-10:8.) At that time, Defendant Kyle ordered x-rays, referred Plaintiff to an ophthalmologist, and prescribed Tylenol.

Plaintiff admits that he received x-rays on January 31, 2003, and that he met with Defendant Kyle on February 3, 2003, to discuss the results, at which time Defendant told him that he had a non-displaced fracture of his nasal bone.  Plaintiff told Defendant Kyle that he was still having problems with his eye and nose, including a bump on his eye and pain in both eyes and his nasal area. (Amend. Comp., p. 10.)  While Plaintiff also denies that no treatment other than pain management is indicated for the injury and that he was referred to an ENT, Plaintiff did not submit any admissible evidence in support of those assertions.[13]  (Opp., 10:25-11:7.)

Plaintiff saw Defendant Kyle on February 7, 2003, and he complained about the lack of medical care for his injuries.  (Amend. Comp., p. 10.)  Plaintiff requested to see an outside doctor, but Defendant Kyle laughed at him and told him if it was going to happen, it would have happened when the injury occurred.  (Id.)  On February 20, 2003, however, Plaintiff was seen by Dr. Kazi and diagnosed with PVD.  Plaintiff does deny that PVD is a common condition and he argues that he had perfect eyesight prior to the injury, but Plaintiff is not qualified to offer his opinion as those issues because he is not a medical expert.  (Opp., p. 11:16-23.)  Likewise, the allegations in Plaintiff's amended complaint that he suffered retinal detachment and that the doctor told Plaintiff he should have been treated when the injury first occurred and due to the time lapse, he could only be monitored are unsupported by admissible evidence.  (Amend. Comp., pp. 9, 10.)

Plaintiff admits that Defendant Kyle prescribed Patanol Optho for him on February 25, 2003, although he asserts that it was Dr. Kazi who indicated it should be prescribed.  (Opp., 12:2-6.) Plaintiff also admits that Defendant Kyle prescribed Naphazoline eye drops on March 21, 2003, and October 24, 2003; that Defendant Kyle examined him and reviewed Dr. Kazi's report on April 24, 2003; and that Defendant Kyle followed up on his complaint of eye pain and ordered pain medication on June 18, 2003.  Plaintiff further admits the evaluation for and receipt of glasses from the optometry clinic.

///

---

[13] The appropriate course of treatment for a nasal fracture is outside the scope of Plaintiff's personal knowledge and he may not offer his opinion on that issue.  Fed. R. Evid. 701, 702.  With respect to the ENT referral, as later discussed, there is no evidence that an ENT consultation ever occurred, but the referral is documented in Plaintiff's medical records.

Plaintiff had a follow-up appointment with the ophthalmologist on August 20, 2003, at which time no retinal breaks, bleeds, or holes were found. Plaintiff denies that he had follow-up appointments with the ophthalmologist on May 4, 2004, and on July 6, 2004. (Opp., 14:4-8 & 14:15-19.) Plaintiff attests that he was only referred for a follow-up on May 4, 2004, and with respect to July 6, 2004, he was waiting for an orthopedic consultation at Mercy Hospital, a fact supported by the record. (Def. Ex. C, pp. 58, 148.)[14]

Finally, while Plaintiff admits that Naproxen, Baclofen and Celebrex/Celecobix were prescribed for him on different dates, he denies that they were prescribed for his eye injury. (Opp., 16:3-8 & 18:4-19:24.) Plaintiff attests that the prescriptions were issued for other, unrelated medical conditions which existed prior to his injury. (Id.) Plaintiff argues that Defendants are attempting to make it seem like they prescribed pain medication for his eye injury when the medications listed were instead prescribed for other conditions. Plaintiff claims his severe eye pain was disregarded and he was not given additional pain medication to treat his eye injury.

### d.     **Discussion**

#### a)     **Legal Standard**

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)). The two part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)).

Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." Id. (citing McGuckin, 974 F.2d

---

[14] The May 4, 2004, record is illegible, but it is a CDCR "Physician Request for Services" form, which supports Plaintiff's assertion that it was a referral rather than an ophthalmology appointment.

at 1060).   Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care."   Id. (citing McGuckin, 974 F.2d at 1060 (internal quotations omitted)).   Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs.   McGuckin, 974 F.2d at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

### b)    Objective Element - Serious Medical Need

Defendants argue that no objectively excessive risk to Plaintiff's health existed because neither a nasal fracture nor PVD poses a serious risk of harm to one's health.   Further, Defendant Kyle was not aware of any risk given that he did not know Plaintiff had a nasal bone fracture until he received the results of the x-ray taken on January 31, 2003, or that Plaintiff had PVD until he received the report from Dr. Kazi following Plaintiff's ophthalmology consultation on February 20, 2003.

"[T]he existence of an injury that a reasonable doctor would find important and worthy of comment or treatment, . . . the presence of a medical condition that significantly affects an individual's daily activities, and . . . the existence of chronic or substantial pain" are indications of a serious medical need.   Doty v. County of Lassen, 37 F.3d 540, 546 n.3 (9th Cir. 1994) (citing McGuckin, 974 F.2d at 1059-1060; Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000).   The evidence submitted by Defendants demonstrates that both a nasal fracture and PVD merit some medical attention.   Regardless, it is the existence of allegedly severe pain which is at issue, and if the failure to treat a condition could result in the unnecessary and wanton infliction of pain, a serious medical need has been shown.   Jett, 439 F.3d at 1096 (quotation marks omitted); Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002) (pain resulting from pepper spray was sufficient to satisfy the objective component of an Eighth Amendment medical care claim).

Plaintiff alleges that he suffered severe pain following his injury on November 11, 2002.   It is unclear from the record whether the source of that pain was the nasal fracture, the PVD, both, or something else.   Whatever the precise source, Plaintiff alleges that he suffered severe, ongoing pain

as a result of the injury sustained on November 11, 2002, and it is the treatment, or lack thereof, of that medical need which is at issue. The Court therefore rejects Defendants' argument that Plaintiff's claim fails because he did not have a serious medical need. There exists a factual dispute regarding whether Plaintiff suffered from chronic or substantial pain such that the failure to treat that pain resulted in the unnecessary and wanton infliction of pain.

### c)    Subjective Element - Deliberate Indifference

The record is clear that Plaintiff received *some* medical attention following his injury. Plaintiff was ultimately diagnosed with a nasal fracture and PVD with no apparent additional harm resulting from the delay in obtaining x-rays or in seeing an ophthalmologist.[15] Although Plaintiff purports to dispute that no other treatment besides pain relief is indicated for nasal fractures and that PVD is a common condition requiring only periodic monitoring to ensure no retinal breaks, Plaintiff is not a medical expert and he is not qualified to render an opinion on those matters. As a result, there is *no* evidence that the delay in obtaining x-rays or sending Plaintiff to Dr. Kazi caused any additional injury to Plaintiff as related to those conditions or that he should have received additional or different specialized medical treatment for those conditions. To the extent that Plaintiff's claims are based in part on further harm resulting from the delay in obtaining x-rays or an ophthalmology consult, Defendants are entitled to judgment.

However, a *complete* denial of medical care is not required to show deliberate indifference, Lopez, 203 F.3d at 1132, and left unaddressed are Plaintiff's persistent complaints of severe, untreated pain. When Plaintiff saw Defendant Kyle for the first time the day after he injured himself, Plaintiff's eye was swollen shut and his requests for additional medical care were denied. While there is evidence that the condition of Plaintiff's injured eye made it impossible to examine the eye or administer eye drops, the failure to assess and/or treat Plaintiff's complaint of pain, which Plaintiff asserts included both eyes, his nose, and his face, is left unaddressed.

///

---

[15] As previously set forth, although Plaintiff alleges in his amended complaint that he suffered from retinal detachment, this allegation is not supported any admissible evidence and notably, Dr. Katz's report following the ophthalmology consultation contains no such diagnosis.

1    Defendants argue that Defendant Kyle did not prescribe pain medication because Plaintiff

2  was already on Methocarbamol and Naproxen, with the prescriptions valid until December 15, 2002.

3  There is, however, no evidence in the record that Defendant Kyle made a determination that pain

4  medication for Plaintiff's injury was unnecessary because Plaintiff was on existing prescriptions

5  sufficient to address any pain caused by his new injury.  Indeed, there is no evidence that Plaintiff's

6  pre-existing prescriptions factored into any decisions made by Defendant Kyle regarding treatment

7  for Plaintiff's eye injury.  Further, Plaintiff disputes that he was on Methocarbamol at that time and

8  the records relied on by Defendants do not show such a prescription.  In addition, Methocarbamol

9  is a muscle relaxant and Defendants cite to no evidence showing that a muscle relaxant is adequate

10 or appropriate to treat pain resulting from facial injuries sustained in a fall.

11    With respect to the pain reliever Naproxen, Dr. Dunn prescribed it as needed up to three

12 times a day for a condition or conditions left unidentified by the parties.  Although the prescription

13 was valid from October 13, 2002, to December 15, 2002, the quantity was sixty pills to be taken up

14 to three times a day, suggesting that Plaintiff could have exhausted the prescription in as few as

15 twenty days, leaving him without any Naproxen by the time he was injured on November 11, 2002.

16 Defendants cite no evidence showing that Plaintiff was actually on Naproxen at that time of his

17 injury or that the previously-prescribed Naproxen dosage was sufficient to treat the pain from

18 Plaintiff's new injury – an injury ultimately diagnosed at least in part as a nasal bone fracture.

19 Defendants bear the burden of production and failed to submit any evidence showing that Defendant

20 Kyle assessed Plaintiff's complaint of eye, nose, and face pain and concluded either that the injury

21 did not warrant pain medication or that no further pain medication was necessary because of

22 Plaintiff's existing Naproxen prescription.  Accordingly, the Court finds that Defendants did not

23 meet their initial burden of demonstrating medical care was provided for Plaintiff's complaint of

24 severe pain.

25    Although ultimately immaterial given the absence of evidence that further harm other than

26 untreated pain is at issue, the Court notes that it is unclear what became of the MRI ordered on

27 November 13, 2002, or the ENT consultation ordered on February 7, 2003.  Plaintiff denies that an

28 MRI was ever ordered.  While Plaintiff's belief that it was never ordered is insufficient to raise a

dispute in light of the medical record provided by Defendants, there is no further evidence in the record relating to an MRI and Defendant Kyle went on to order x-rays, a lesser diagnostic test, approximately one month later.  Similarly, there is no further evidence in the record concerning an ENT consultation.

Following the removal of his sutures on November 18, 2002, Plaintiff sought treatment for his pain via a doctor's line request handed to Defendant Domingo, and between the dates of November 19, 2002, and December 13, 2002, he submitted fifteen requests to Defendant Domingo and Nurse Ruff seeking medical treatment and complaining of pain.  It is unclear what happened to those requests, but Plaintiff received no medical attention until December 13, 2002, and he contends that Defendant Domingo and Nurse Ruff refused to process the forms or let him see a doctor. Although Defendant Kyle claims that Plaintiff was repeatedly "ducated" for medical appointments, but the institution was on lock-down and he was unable to see Plaintiff during that time period, Plaintiff disputes that fact, taking the position that there was no lock-down and his requests were simply ignored.[16,17]

Also in dispute are the events of December 11, 2002.  While Defendant Domingo claims that she saw and evaluated Plaintiff, and she referred him to Defendant Kyle the next day, Plaintiff denies that he was seen by Defendant Domingo that day.  Plaintiff was subsequently seen by Defendant Kyle on December 13, 2002, but he was seen in conjunction with the inmate appeal he filed and that meeting was documented in the second-level response to Plaintiff's appeal. (Pl. Ex. E.)  Indeed, the medical notes regarding the events of November 11, 2002, and November 12, 2002, were set forth in a lengthy note made on December 13, 2002, and there is no suggestion in the record that Defendant Kyle met with and examined Plaintiff other than as a result of the appeal interview. Plaintiff was provided with a Tylenol prescription on that date; the prescription was apparently for a quantity of sixty pills, but Defendants did not inform the Court how many times a day Plaintiff was to take the Tylenol, leaving unclear how long the supply of medication lasted.

---

[16] A ducat is a written pass issued to summon inmates for medical or other appointments.

[17] The Court notes that lock-downs are well documented events, but Defendants did not provide any records other than Defendant Kyle's medical note, made on December 13, 2002.

X-rays were taken on January 31, 2003; Plaintiff met with Defendant Kyle on February 3, 2003, to discuss the pending ophthalmology appointment; and Plaintiff met with Defendant Kyle on February 7, 2003, to discuss the results of the x-rays, which revealed a nasal bone fracture. Although pain management is the treatment indicated for a nasal fracture, it is unclear what, if any, pain medication Plaintiff was on at that time.

Plaintiff was seen by Dr. Kazi, an ophthalmologist, on February 20, 2003, and diagnosed with PVD, a condition which required only monitoring to ensure the absence of a retinal tear. Following Plaintiff's consultation with Dr. Kazi, Defendant Kyle provided him with an antihistamine that relieved eye irritation (Patanol Optho) on February 25, 2003, and a decongestant that relieved eye irritation (Naphazoline) on February 27, 2003. Plaintiff was also provided with Naphazoline on numerous occasions. While the evidence indicates that Naphazoline was prescribed to treat Plaintiff's eye injury, it is unclear if that injury was the PVD or something else and it is unclear if the injury treated by the Naphazoline was the source of Plaintiff's eye pain.[18]  (Kyle Dec., ¶¶27-30.) Further, although Defendant Kyle contends that he prescribed Naproxen on March 21, 2003, to treat Plaintiff's pain, Plaintiff contends that the prescription was issued for a different medical condition which existed prior to the injury. The medical record submitted by Defendants provides no illumination on this issue, as it lists only the prescriptions and does not set forth any information on the underlying condition for which the Naproxen was prescribed. (Ex. C, p. 15.) Plaintiff then had another follow-up with Defendant Kyle on April 24, 2003, regarding the ophthalmology consult and glasses are mentioned in the medical record note.[19]

Seven months after his injury, Plaintiff was still experiencing severe eye pain and Defendant Kyle saw him regarding his complaint of pain on June 18, 2003. The parties agree that Defendant Kyle prescribed pain medication for Plaintiff at that time, although what was prescribed and for how long is left unclear.

---

[18] The evidence suggests PVD is a condition rather than an injury and it is unclear if the condition was caused by the injuries Plaintiff sustained on November 11, 2002.

[19] The parties agree that Plaintiff received prescription eyeglasses, but those facts are immaterial given that there is no evidence linking a need for prescription eyeglasses to Plaintiff's complaint of eye pain.

Although Plaintiff was prescribed Naproxen, Baclofen, and Celecobix in 2003 and 2004, there is no evidence explaining what the prescriptions were issued for and Plaintiff disputes that they were for his eye injury, attesting that they were prescribed for his pre-existing medical conditions. Also absent is any evidence that Plaintiff's repeated complaints of eye pain were assessed by medical personnel but a determination was made that no additional pain medication was indicated in light of the pain medication Plaintiff was taking for his other medical conditions.

In the end, the Court is left with more questions than answers.  Plaintiff sustained a laceration and a nasal bone fracture following his fall.  Plaintiff was also diagnosed with PVD, although it is unclear whether the condition was caused by or otherwise relates to Plaintiff's facial injuries. Plaintiff complaints of untreated eye, nose, and face pain began on November 12, 2002, and continued indefinitely.  For his complaints of pain, Plaintiff was prescribed Tylenol, sixty-count, on December 13, 2002, and an unknown quantity of an unknown pain medication on June 18, 2003, leaving lengthy periods of time during which Plaintiff was presumptively without any treatment for his complaints of severe eye pain.

Although Plaintiff was provided with two kinds of prescription eye drops following his diagnosis of PVD, it is unclear if those eye drops were issued to, or did, ameliorate his eye pain. Indeed, the Court is not aware if the source of Plaintiff's eye pain was the nasal fracture, the PVD, both, or neither.  Plaintiff made his severe pain known to both Defendant Domingo and Defendant Kyle on numerous occasions and other than on December 13, 2002, and June 18, 2003, there is no evidence that Plaintiff's complaints of pain were assessed and treated or were assessed but not separately treated due to Plaintiff's other existing prescriptions.

Chronic or substantial pain is sufficient to show a serious medical need and the knowing disregard of such a need suggests deliberate indifference.  In light of the evidence that Plaintiff complained to Defendants repeatedly that he was in severe pain but they failed to provide treatment for his complaints of pain, Defendants Kyle and Domingo are not entitled to judgment as a matter of law on Plaintiff's claim of untreated pain following the injuries he sustained on November 11, 2002.

///

1

2.      **Skin Tags**

2

a.      **Undisputed Facts**

3

On May 5, 2003, Plaintiff was seen by Dr. Luu, an outside specialist in dermatology.  (Kyle

4

Dec., ¶32; Def. Ex. C, p. 149.)  Plaintiff was diagnosed in part with skin tags, which are small flaps

5

of tissue that hang off the skin by a connecting stalk.  (Kyle, ¶¶14, 15; Ex. C, p. 149.)  Skin tags are

6

usually found on the neck, chest, back, armpits, under the breasts, or in the groin area.  (Kyle, ¶15.)

7

Skin tags are not dangerous, they pose no risk to an individual's health, and they usually do not cause

8

any pain.  (Kyle, ¶¶15, 17.)  Skin tags can be treated with topical ointment such as hydrocortisone

9

cream and gentian violet solution, or they can be removed with a scalpel or scissors, cryosurgery

10

(freezing off), or electrosurgery (burning off with an electric current).  (Kyle, ¶16.)  Dr. Luu

11

suggested that Plaintiff's skin tags be removed.  (Kyle, ¶32; Ex. C, p. 149.)

12

On August 25, 2003, Defendant Kyle examined and treated Plaintiff for a skin irritation and

13

foot fungus.  (Kyle, ¶41; Ex. C, pp. 7, 25.)

14

On December 29, 2003, Defendant Kyle prescribed Celecobix for pain.  (Kyle, ¶45; Ex. C,

15

p. 59.)

16

On May 10, 2004, a written referral to a dermatologist for removal Plaintiff's skin tags was

17

issued.  (Kyle, ¶52; Ex. C, p. 147.)  However, on June 15, 2004, the Medical Authorization

18

Committee (MAR) determined that it was appropriate for a doctor at CSATF to remove Plaintiff's

19

skin tags and the referral was denied.  (Kyle, ¶54; Ex. C, p. 147.)    Plaintiff's skin tags were

20

subsequently removed by Dr. Luu on August 18, 2004.  (Kyle, ¶59.)

21

b.      **Defendants' Position**

22

On May 5, 2003, Plaintiff was seen by Dr. Luu and diagnosed with skin tags, which are small

23

flaps of tissue that hang off the skin by a connecting stalk, usually found on the neck, chest, back,

24

armpits, under the breasts, or in the groin area.  Dr. Luu noted that there would be another visit to

25

remove the skin tags.

26

Skin tags are not dangerous, they pose no risk to an individual's health, and they usually do

27

not cause any pain; and they can be treated with topical ointment such as hydrocortisone cream and

28

gentian violet solution, or they can be removed with a scalpel or scissors, cryosurgery, or

electrosurgery.  Plaintiff was provided with Vytone cream to treat his skin tags, and on May 7, 2003, Plaintiff was provided with hydrocortisone cream and gentian violet for his skin tags.  (Kyle Dec., ¶¶32, 33; Ex. C, p. 149.)  Plaintiff was again provided with hydrocortisone cream for his skin tags on May 19, 2003, and on June 4, 2003.  (Kyle Dec., ¶¶34, 35.)  On January 21, 2004, Plaintiff was provided with erythromycin for his skin tags.  (Kyle Dec., ¶46.)

On May 4, 2004, and on May 10, 2004, Plaintiff was referred to Dr. Luu regarding removal of his skin tags, but the MAR denied the referral on June 15, 2004, finding that Plaintiff's skin tags could be removed at the prison.  Plaintiff's skin tags were later removed by Dr. Luu on August 18, 2004.

Defendant Kyle contends that in his medical opinion, Plaintiff's skin tags did not need to be removed, they were removed only because Plaintiff continued to voice concerns about them, and their removal was delayed because Plaintiff refused to have them removed by a prison doctor and insisted he be referred to a specialist.

### c.   Plaintiff's Position

On October 11, 2002, Plaintiff was referred to an outside dermatologist for a persistent rash in his groin area, stomach, and underarms which had not responded to treatment.  (Amend. Comp., p. 13.)  In December 2002, Plaintiff was unable to leave the institution due to the injuries he sustained in the fall on November 11, 2002.  (Id.)  However, on May 5, 2003, Plaintiff was seen by Dr. Luu in Bakersfield.  Plaintiff was treated for erythrasma and he was scheduled for a follow-up appointment to remove skin tags from his arm pits.  (Id.)  The skin tags were up to an inch long, hurt all the time, and bled.  (Amend. Comp., p. 13; Opp., pp. 14:25-15:4.)

On September 9, 2003, Plaintiff sent a request for an interview regarding scheduling his follow-up appointment with the dermatologist.  (Id.)  Plaintiff was told that a copy was sent to Defendant Kyle and Defendant would have to request the follow-up.  (Id.)

On February 2, 2004, Plaintiff saw Defendant Kyle, who told him that he would not need to see the outside dermatologist again because Defendant was going to remove Plaintiff skin tags.  (Id., pp. 13, 14.)  However, nothing was done and Defendant Kyle subsequently became the Acting Chief Medical Officer.  (Amend. Comp., p. 14; Brown Dec., ¶16.)  Dr. Nguyen then became Plaintiff's

1  treating physician and he placed a request for Plaintiff to see Dr. Luu for removal of his skin tags.

2  (Amend. Comp., p. 14; Brown Dec., ¶16.)  The request was approved on May 10, 2004, and assigned

3  a tracking number, but it was subsequently denied by Defendant Kyle and Plaintiff filed an inmate

4  appeal grieving the cancellation.  (Amend. Comp., p. 14; Brown Dec., ¶16.)

5       Plaintiff denies having ever been provided Vytone cream for his skin tags, and he contends

6  that he was never provided with any treatment for his skin tags by prison doctors.  (Amend. Comp.,

7  p. 14; Brown Dec., ¶¶15, 16; Opp., 15:19-24 & 16:17-23.)  Although Plaintiff's skin tags were

8  ultimately removed by Dr. Luu on August 18, 2004, Plaintiff contends that his condition went

9  untreated for almost two years, and the skin tags were finally removed because of Plaintiff's inmate

10  appeals.  (Amend. Comp., p. 14; Brown Dec., ¶16; Opp., 17:1-10; Pl. Ex. H, I.)

### d.    Discussion

#### a)    Serious Medical Need

13       As with the injuries Plaintiff sustained in his fall, the Court is left with more questions than

14  answers regarding Plaintiff's skin tags.  It is undisputed that skin tags are not dangerous, they pose

15  no risk of harm to the patient's health, and they *usually* do not cause pain.  However, Plaintiff alleges

16  that *his* skin tags were large and painful, and that they bled.

17       Defendants provided the Court with scant evidence regarding the state of Plaintiff's skin tags,

18  and although Defendant Kyle attests that he did not believe Plaintiff's skin tags needed removed, left

19  unaddressed are Plaintiff's allegations regarding the pain and bleeding.  Dr. Luu, the outside

20  dermatologist, noted that Plaintiff had skin tags under both arm pits which reportedly hurt Plaintiff

21  and which would be removed in another visit.

22       In light of Plaintiff's attestation that his skin tags caused him pain and bled, a condition

23  which existed for at least fifteen months, the Court finds the existence of a genuine dispute as to

24  whether Plaintiff's skin tags constituted a serious medical need.

#### b)    Deliberate Indifference

26       It is unclear when Plaintiff's skin tags began to bother him.  Defendants rely on Dr. Luu's

27  report for the initial identification of this medical issue and therefore, it is unclear if there is any

28  earlier record of that medical complaint.  While Dr. Luu documented the skin tags when she saw

Plaintiff on May 5, 2003, Plaintiff was referred to Dr. Luu for a persistent rash rather than for skin tags. Defendants contend that Plaintiff was provided with Vytone cream for his skin tags following his consultation with Dr. Luu, but Dr. Luu's report does not support that contention.

Plaintiff was seen by Dr. Luu for lesions on both sides of his groin and in the middle of his chest. Dr. Luu recommended erythromycin, gentian violet solution, and "Vytone cream BID to all *lesions*." (Def. Ex. C, p. 149 (emphasis added).) The diagnosis of Plaintiff's condition as intertrigo due to erythrasma and the recommended treatment are set forth together in one section, while Dr. Luu's note regarding the existence of Plaintiff's skin tags, his report that they hurt, and their future removal is set forth separately at the end of the report, suggesting that while the issue was raised by Plaintiff during the visit and documented, because the consultation was not regarding his skin tags, no medications or others courses of treatment were prescribed at that time.

Defendants next report that Defendant Kyle saw and treated Plaintiff for a skin irritation and foot fungus on August 25, 2003. The relevance of that event is unclear, as the rash in question was on Plaintiff's face and his skin tags were not mentioned in the medical record that was provided.

Defendants then assert that Defendant Kyle prescribed Celecobix for pain on December 29, 2003. However, Defendants cite to no evidence demonstrating that the Celecobix was prescribed for Plaintiff's skin tags and Plaintiff attests that the medication was for a pre-existing medical condition unrelated to his skin tags.

A referral back to Dr. Luu to remove the skin tags was issued on May 10, 2004, but that referral was subsequently cancelled on June 15, 2004, by the MAR, purportedly because the skin tags could be removed in-house. Then, inexplicably, Dr. Luu removed Plaintiff's skin tags on August 18, 2004, fifteen months after the issue was first noted in Dr. Luu's consultation report.

Although Defendants contend that Plaintiff was prescribed medication to treat his skin tags, the evidence does not support that contention. Defendants assert that Plaintiff was prescribed Vytone cream, hydrocortisone cream, and gentian violet solution for his skin tags in May and June of 2003.[20] However, those medications were recommended by Dr. Luu to treat Plaintiff's rash.

---

[20] The Court takes judicial notice of the fact that Vytone cream is a hydrocortisone cream.

Indeed, Defendant Kyle noted during the unrelated August 25, 2003, appointment that Plaintiff was applying gentian violet solution to a rash on his face.

Defendants also cite to twelve medical records for the proposition that Plaintiff received medication for his skin tags. Those records, however, consist of copies of medication labels and medication administration records. The prescriptions listed included Naproxen and Celecobix, medications which Plaintiff contends were prescribed repeatedly for pre-existing medical conditions not at issue in this suit; Maalox for heartburn; erythromycin, gentian violet solution, and Vytone cream, recommended by Dr. Luu for Plaintiff's rash; and Naphazoline (for Plaintiff's eye injury). There is no accompanying evidence to show that one or more of these medications were prescribed to treat Plaintiff's skin tags.

Finally, although Defendant Kyle attests that the removal of Plaintiff's skin tags was delayed because Plaintiff refused to allow a prison doctor to remove them, there is no supporting evidence offered. Indeed, the record is devoid of any evidence regarding the assessment and treatment of Plaintiff's skin tags except for Dr. Luu's consultation report from May 5, 2003, the cancelled dermatology referral made on May 5, 2004, and the parties' agreement that the skin tags were ultimately removed by Dr. Luu on August 18, 2004.

In conclusion, Defendant Kyle failed to show that he assessed and provided appropriate medical care for Plaintiff's skin tags, which allegedly hurt and bled. Therefore, the Court recommends that Defendant Kyle's motion for summary judgment on that claim against him be denied.

### 3. Qualified Immunity

Defendants argue that they are entitled to qualified immunity because Plaintiff cannot show that they violated a clearly established constitutional right given that they provided him with adequate medical care. Further, they argue that in light of the undisputed facts, reasonable persons in their position would have believed they acted lawfully.

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). "Qualified

immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, ___, 129 S.Ct. 808, 815 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).

In resolving a claim of qualified immunity, courts must determine whether, taken in the light most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001); Delia v. City of Rialto, 621 F.3d 1069, 1074 (9th Cir. 2010); Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009). While often beneficial to address in that order, courts have discretion to address the two-step inquiry in the order they deem most suitable under the circumstances. Pearson, 555 U.S. at ___, 129 S.Ct. at 818 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Delia, 621 F.3d at 1074-75; Mueller, 576 F.3d at 993-94.

Here, Defendants provided no evidence that they assessed Plaintiff's repeated complaints of pain caused by the injuries he sustained in the fall of November 11, 2002, or his repeated complaints of pain and bleeding caused by his skin tags, and that they provided appropriate medical care given those medical complaints. Rather, viewing the evidence in the light most favorable to Plaintiff, e.g., Brooks v. City of Seattle, 599 F.3d 1018, 1021-22 (9th Cir. 2010), his complaints of pain from his facial injuries and skin tags received no medical treatment, leaving him to suffer needless pain for a lengthy period of time. As such, Plaintiff has shown, limited to the resolution of this motion, a violation of his constitutional rights.

At the earliest, the events began in November 2002 and by that time, the law was clearly established that chronic or substantial pain can constitute a serious medical need, Clement, 298 F.3d at 904; Lopez, 203 F.3d at 1131; Doty, 37 F.3d at 546 n.3; McGuckin, 974 F.2d at 1059, and that prison officials cannot knowingly disregard a serious medical need, Estelle, 429 U.S. at 104-05; Clement, 298 F.3d at 904-05; Lopez, 203 F.3d at 1132; Jackson v. McIntosh, 90 F.3d 330, 331-32 (9th Cir. 1996); McGuckin, 974 F.2d at 1060. Accordingly, Defendants are not entitled to qualified

27

immunity.

**IV.     Recommendation**

For the reasons set forth herein, the Court HEREBY RECOMMENDS that:

1.     Plaintiff's motion to strike Defendants' reply, filed June 7, 2011, be DENIED;

2.     Defendants be granted judgment on Plaintiff's eye injury claim to the limited extent that it is based in part on further harm resulting to Plaintiff from a delay in obtaining x-rays and/or seeing an ophthalmologist;

3.     Defendants Kyle and Domingo's motion for summary judgment on Plaintiff's claim that they failed to treat his complaints of pain following the injury he sustained on November 11, 2002, be DENIED;

4.     Defendant Kyle's motion for summary judgment on Plaintiff's claim that he failed to treat Plaintiff's skin tags be DENIED;

5.     Defendants Kyle and Domingo's motion for summary judgment on qualified immunity grounds be DENIED; and

6.     This matter be set for a settlement conference if all parties believe one would be beneficial and for trial.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:     August 2, 2011**                                   **/s/ Sheila K. Oberto**
                                                    UNITED STATES MAGISTRATE JUDGE